UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

MICHAEL CALDERON,

Plaintiff,

v.

ASHLEY MULLIGAN-PFILE, et al.,

Defendants.

Case No. 18-cv-01318-HSG (PR)

**ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

Re: Dkt. No. 17

## I.    INTRODUCTION

Plaintiff, a former state prisoner who was previously incarcerated at the California Correctional Training Facility ("CTF"), filed this *pro se* civil rights action under 42 U.S.C. § 1983, alleging that he has been provided inadequate medical care.  Starting in September 2015, Plaintiff claims that he has been requesting to have a magnetic resonance imaging ("MRI") or ultrasound test so that his exercise-related injury sustained around June 2015 could be properly diagnosed and treated.  Plaintiff alleges that his requests have been denied at various levels of inmate administrative appeal review by Defendants CTF medical doctors Ashley Mulligan-Pfile, S. Posson, and Michael K. Mindoro.  The Court found that, liberally construed, the complaint stated a cognizable claim for deliberate indifference to Plaintiff's serious medical needs in violation of the Eighth Amendment against Defendants.

Now before the Court is Defendants' motion for summary judgment.  Plaintiff has filed an opposition, and Defendants have filed a reply.

## II.    BACKGROUND[1]

### A.    The Parties

At the time of the events set forth in his complaint, which occurred between September

---

[1] This order contains many acronyms and abbreviations.  Here, in one place, they are:

| | |
|---|---|
| CTF | Correctional Training Facility |
| EKG | electrocardiograph |
| MRI | magnetic resonance imaging |

2015 and the time he filed suit in February 2018, Plaintiff was a state prisoner who was incarcerated at CTF. *See* Dkt. No. 1 at 1.[2] During that period, Defendants were employed by CTF. Specifically, Defendant Mindoro was Plaintiff's primary care physician ("PCP") from July 2015 through July 2017, the date Defendant Mindoro transferred to Salinas Valley State Prison ("SVSP"). Mindoro Decl. ¶ 7. Defendants Mulligan-Pfile and Posson, who are both licensed physicians, reviewed and denied the relevant grievance (health care inmate appeal CTF HC 17044926 filed on December 27, 2016, in which Plaintiff requested an MRI or an ultrasound) at the first and second levels of review, respectively. Posson Decl. ¶ 1; Mulligan-Pfile Decl. ¶ 13.

### B. Plaintiff's Version

The following background relating to Plaintiff's Eighth Amendment claim is taken from the Court's May 1, 2018 Order:

> According to the complaint, several years ago, plaintiff suffered a tear in his pectoral muscle that requires surgery. Starting in September 2015, he has been requesting to have an MRI or ultrasound so that the injury can be properly diagnosed and treated. His requests have been denied at various levels of inmate administrative appeal review by defendants CTF medical doctors Ashley Mulligan-Pfile, S. Posson, and Michael K. Mindoro. These allegations, liberally construed, state a claim of deliberate indifference against Ashley Mulligan-Pfile, S. Posson, and Michael K. Mindoro.
>
> The potential liability of defendants is under the Eighth Amendment, and is not under the Fourteenth Amendment's Due Process Clause. There is no constitutional right to a prison or jail administrative appeal or grievance system in California, and therefore no due process liability for failing to process or decide an inmate appeal properly. *See Ramirez v. Galaza*, 334 F.3d 850, 860 (9th Cir. 2003); *Mann v. Adams*, 855 F.2d 639, 640 (9th Cir. 1988). It is alleged here, however, that by denying or improperly handling such appeals, defendants Ashley Mulligan-Pfile, S. Posson, and Michael K. Mindoro denied medical care that plaintiff alleges was sorely needed. Thus, it is for the denial of medical care that these defendants may be held liable, not simply for denying administrative appeals.

Dkt. No. 8 at 3 (footnote renumbered).

| | |
|---|---|
| PCP | primary care physician |
| RN | Registered Nurse |
| SVSP | Salinas Valley State Prison |
| Triage Clinic | Triage & Treatment Area |

[2] Page number citations for Plaintiff's filings refer to those assigned by the Court's electronic filing system and are located at the top right hand corner of each page.

### C.  Defendants' Version

#### 1.  Overview of Defendant Mindoro's Diagnosis, Treatment, and Care of Plaintiff

##### a.  Initial Diagnosis and Treatment: Muscle Strain

As mentioned above, Defendant Mindoro was Plaintiff's PCP at CTF until the doctor's transfer to SVSP in July 2017.  Mindoro Decl. ¶ 7.  From July 2015 through August 2016, Defendant Mindoro saw Plaintiff on no fewer than seven occasions for his alleged injury.  *Id*.  Plaintiff also saw several other medical professionals, including CTF doctors and nurses and medical professionals at Natividad Medical Center, during this period.  *Id*.

Plaintiff first sought treatment about the condition at issue in this case on July 3, 2015, when he presented with complaints of tingling in the left parietal[3] with intermittent headaches and light-headedness.  *Id*. at ¶ 9.

Plaintiff's medical records show that he first requested treatment in a CDC 7362 Health Care Services Request on July 3, 2015, in which he indicated as follows: "I am feeling dizzy and light headed at times and am also feeling tingly numbing sensation on the top and back of my head."  Skebe Decl. ¶ 5 & Ex. B (AGO 0226-0228).  Plaintiff claimed these symptoms resulted from overexerting himself while doing pull-ups about one month earlier.  Mindoro Decl. ¶ 9.  Plaintiff was initially diagnosed and treated for suspected muscle strain to the neck based on his complaints and reported symptoms, self-reported history, multiple physical examinations, diagnostic testing, and laboratory work.  *Id*.

In response to Plaintiff's complaints and reported symptoms, Defendant Mindoro and several other physicians ordered that Plaintiff receive diagnostic testing, imaging, and laboratory work.  *Id*. at ¶ 10.  On July 22, 2015, Defendant Mindoro ordered that Plaintiff receive an electrocardiograph ("EKG"), blood tests, and a urine analysis.  *Id*. at ¶ 11; *see* Skebe Decl. & Ex. B (AGO 0165-0166, 0225).  On September 18, 2015, Defendant Mindoro ordered that Plaintiff receive an EKG, chest x-ray, blood tests and a urine analysis.  Mindoro Decl. ¶ 11; Skebe Decl. & Ex. B (AGO 0160-0161, 0217, 0225, 0249).  At various times, other physicians ordered that

---

[3] "Left parietal" means the left side of Plaintiff's head.  Mindoro Decl. ¶ 9.

1  Plaintiff receive a cervical spine x-ray, EKGs, blood work, chest x-ray, and a toxicology screen.

2  Mindoro Decl. ¶¶ 12-16; Skebe Decl. & Ex. B (AGO 0157-0158, 0162, 240-243, 0247-0248,

3  0250, 0255-0269).  The results of these tests were negative or otherwise unremarkable.  Mindoro

4  Decl. ¶¶ 11, 17.

5       As part of his treatment of Plaintiff, Defendant Mindoro prescribed anti-inflammatories

6  and pain medication, including, at various times, ibuprofen, naproxen, and Tylenol, and instructed

7  Plaintiff to moderate his activity as tolerated.  Mindoro Decl. ¶19; Skebe Decl. & Ex. B (AGO

8  0208, 0225).  At various times, other physicians prescribed additional or alternative medications,

9  including toradol, a nonsteroidal anti-inflammatory used to treat moderate to severe pain,

10  naproxen, an alternative anti-inflammatory to ibuprofen, and a thirty-day trial of vistaril for

11  anxiety.  Mindoro Decl. ¶ 19; Skebe Decl. ¶ 9 & Ex. B (AGO 0211-0215, 0219-0221).

12       The diagnosis of muscle strain was echoed by other medical professionals who treated

13  Plaintiff during this time, including Dr. Hedden, who consulted during Plaintiff's requested

14  emergency visit to the Triage & Treatment Area ("Triage Clinic") on September 6, 2015.

15  Mindoro Decl. ¶ 20; Skebe Decl. ¶ 9 & Ex. B (AGO 0219-0221).

16       On various occasions, Plaintiff reported an improvement in his condition, though these

17  reports were often followed weeks or even days later with complaints of continuing and increased

18  pain.  Mindoro Decl. ¶ 21.  For example, during an appointment with Defendant Mindoro on

19  October 22, 2015, Plaintiff described his symptoms as "a little better," but said that he still had

20  mild discomfort swallowing.  *Id.*; Skebe Decl. ¶ 15 & Ex. B (AGO 0208).

21       On November 10, 2015, Plaintiff saw Defendant Mindoro for an ear infection and, when

22  the doctor inquired about Plaintiff's neck muscle strain injury, Plaintiff indicated that he was

23  without pain in his neck or chest and reported significant improvement in pain symptoms with

24  activity.  Mindoro Decl. ¶ 21; Skebe Decl. ¶ 17 & Ex. B (AGO 202).  In response to Plaintiff's

25  request for an MRI and belief that he needed surgery, Defendant Mindoro told him that his muscle

26  strain appeared to be healing well, and that neither a surgery nor an MRI was medically indicated.

27  *Id.*

28  //

4

**b. Diagnosis and Treatment for Costochondritis**

According to Defendant Mindoro, Plaintiff's complaints regarding "the location, character and quality of his symptoms and pain continued to change over time." Mindoro Decl. ¶ 23.

On June 2, 2016, Plaintiff saw Defendant Mindoro the day after seeing Dr. Sweet for an emergency medical visit at the Triage Clinic for chest pain. *Id.* at ¶ 25; Skebe Decl. ¶ 20 & Ex. B (AGO 0187-0189). On examination, Defendant Mindoro found Plaintiff to have reproducible tenderness over the sternum, but Plaintiff's condition was otherwise unremarkable. *Id.* Defendant Mindoro also reviewed the records regarding the medical treatment Plaintiff received on June 1, 2016, including his normal EKG results, his negative chest x-rays, and Dr. Sweet's diagnosis of Tietze syndrome. *Id.*; *see also* Skebe Decl. ¶ 19 & Ex. B (AGO 0191-0194). Based this information, Defendant Mindoro made a differential diagnosis of Tietze syndrome versus costochondritis. Mindoro Decl. ¶ 25. Defendant Mindoro states that the two conditions are similar in several respects including the inflammation of the cartilage of the ribs, but Tietze syndrome is associated with chest swelling. *Id.* at ¶¶ 24-25. Costochondritis may cause reproducible chest pain on palpation and there can be chest pain with any activity that causes the ribs to move, such as coughing or deep breathing. *Id.* at 24. The condition is relatively harmless and generally abates over time. *Id.* Treatment for costochondritis involves non-steroidal anti-inflammatories, pain relievers, and moderated activity. *Id.*

On June 3, 2016, Plaintiff was transported off-site to Natividad Medical Center based on his report of chest pain. *Id.* at ¶ 26; Skebe Decl. ¶ 22 & Ex. B (AGO 0255-0269). After a physical examination, an EKG, chest x-ray, and laboratory tests with negative results, Dr. Lawson diagnosed Plaintiff with acute costochondritis and atypical chest pain, and discharged Plaintiff back to CTF the same day. *Id.*

On June 7, 2016, Defendant Mindoro conducted a further physical examination of Plaintiff, reviewed his records and test results from Natividad Medical Center, and refined Plaintiff's diagnosis to costochondritis. Mindoro Decl. ¶ 27, *see also* Skebe Decl. ¶ 23 & Ex. B (AGO 0180- 0181).

For treatment, Defendant Mindoro discontinued naproxen, started a trial of ibuprofen

consistent with Natividad's recommendation, prescribed Tylenol for pain management, and advised Plaintiff to moderate his activity as tolerated. Mindoro Decl. ¶¶ 28, 30; Skebe Decl. ¶ 23 & Ex. B (AGO 0180-0181).

Defendant Mindoro's last appointment with Plaintiff was August 11, 2016. Mindoro Decl. ¶ 29; Skebe Decl. ¶ 25 & Ex. B (AGO 0171-0174). Plaintiff advised that his symptoms persisted, but that he found some relief by refraining from upper body exercise. *Id.* Plaintiff stated that ibuprofen provided poor relief to his pain, and in response Defendant Mindoro prescribed a trial of sulindac in lieu of ibuprofen and a continuation of Tylenol. *Id.* On examination, Defendant Mindoro noted reproducible tenderness over the sternum, but nothing else remarkable. *Id.* Defendant Mindoro instructed Plaintiff to engage in physical activity only as tolerated and counseled Plaintiff on exercise, medication, and activity. *Id.* Defendant Mindoro transferred to a different facility in July 2017. Mindoro Decl. ¶¶ 3, 7.

### 2. Specific Treatments Provided to Plaintiff During His Medical Visits in 2015

Since Plaintiff's first request for medical care for his alleged injury on July 3, 2015, Plaintiff saw Defendant Mindoro on four occasions in 2015, as described below. *Id.* at ¶¶ 6, 11, 15, 17 & Ex. B (AGO 0202, 0208, 0217, 0225). In addition, Plaintiff saw nursing staff on several occasions in response to CDC 7362 Health Care Service Requests he submitted and was taken at his request for emergency treatment the Triage Clinic on two occasions. *Id.* at ¶¶ 5, 7-9, 12-14, 16 & Ex. B (AGO 0204-0207, 0209-0216; 0219-0221; 0223-0224; 0226-0228).

### a. July 22, 2015 Visit with Defendant Mindoro

Prior to Plaintiff's first visit with Defendant Mindoro, Plaintiff saw Nurse Lozada on July 14, 2015 in response to a CDC 7362 Health Care Services Request he submitted on July 3, 2015. Skebe Decl. ¶ 5 & Ex. B (AGO 0226-0228). Plaintiff told Nurse Lozada that he was doing pull-ups three weeks to one month earlier and felt numbness in his left shoulder that he now believed to be an ongoing pinched nerve, as well as pain, tingling, and pressure on the top of his head. *Id.* Nurse Lozada referred Plaintiff to his PCP, Defendant Mindoro, who advised Plaintiff to follow-up in the Registered Nurse ("RN") clinic in 72 hours if his headache persisted, and prescribed Acetaminophen for his pain, which he refused. *Id.*

On July 22, 2015, Plaintiff saw Defendant Mindoro.  Skebe Decl. ¶ 6 & Ex. B (AGO 0225).  Plaintiff complained of tingling in the left parietal with intermittent headaches and light-headedness.  *Id.*; *see* Mindoro Decl. ¶ 9.  Defendant Mindoro conducted a physical assessment of Plaintiff's general state, his head, eyes, ears, nose, throat and neck, as well as Plaintiff's cardiac, pulmonary, and neurological functions with unremarkable results.  Skebe Decl. ¶ 6 & Ex. B (AGO 0225).  Defendant Mindoro noted that Plaintiff had his wisdom tooth removed and that some symptoms persisted.  *Id.*  Defendant Mindoro noted that Plaintiff had a headache a week ago which resolved with ibuprofen.  *Id.*

Defendant Mindoro diagnosed Plaintiff with possible tension headaches, instructed him to keep a headache diary, and prescribed ibuprofen for pain.  *Id.*  Due to Plaintiff's complaints of intermittent dizziness, Defendant Mindoro ordered blood tests, urine analysis, and an EKG.  *Id.*; Skebe Decl. ¶ 6 & Ex. B (AGO 0166-0166).

### b.  September 18, 2015 Visit with Defendant Mindoro

On September 18, 2015, Plaintiff had a follow-up visit with Defendant Mindoro.  Skebe Decl. ¶ 11 & Ex. B (AGO 0217).  Plaintiff stated he attempted to jog the day before, but felt his breathing was restricted, that his chest felt tight, and he experienced twitching over his left supraclavicular fossa.[4]  *Id.*  Defendant Mindoro observed no masses or deformities to the area, no pyrosis[5] or regurgitation, no dry cough or wheezing, and no other external symptoms.  *Id.*  Plaintiff stated he experienced less left parietal tingling than he had previously experienced.  *Id.*

Defendant Mindoro reviewed Plaintiff's records regarding the medical treatment Plaintiff received from other medical providers since his last visit with Defendant Mindoro on July 22, 2015, including his September 6, 2015 visit to the Triage Clinic and consultation with Dr. Hedden,

---

[4] "Supraclavicular" means "situated or occurring above the clavicle."  *See* Merriam-Webster Online Dictionary, retrieved July 12, 2019, from https://www.merriam-webster.com/medical/supraclavicular.  And a "fossa" is "an anatomical pit, groove, or depression."  *See id.*, retrieved July 12, 2019, from https://www.merriam-webster.com/dictionary/fossa.  So a supraclavicular fossa is a depression immediately above the clavicle.

[5] "Pyrosis" is heartburn.  *See* Merriam-Webster Online Dictionary, retrieved July 12, 2019, from https://www.merriam-webster.com/dictionary/pyrosis.

as well as the results of the cervical spine x-ray Dr. Ahmed ordered on September 9, 2015.

Mindoro Decl. ¶¶ 12, 17; *see also* Skebe Decl. ¶ 10 & Ex. B (AGO 0162). Defendant Mindoro

noted Plaintiff's cervical spine x-ray was unremarkable. Skebe Decl. ¶ 11 & Ex. B (AGO 0217,

0250).

Defendant Mindoro assessed that Plaintiff's left neck pain likely was from muscle strain.

*Id.* This assessment was consistent with the findings of Dr. Hedden on September 6, 2015, during

Plaintiff's Triage Clinic visit. *Id*. at ¶ 9 & Ex. B (AGO 0219-0221).

Because he was concerned about Plaintiff's complaints of restricted breathing, Defendant

Mindoro established a plan to rule out dyspnea,[6] which included an order for a chest x-ray, EKG,

and laboratory work. *Id*. at ¶ 11 & Ex. B (AGO 0160-0161, 0217).

Defendant Mindoro assessed Plaintiff as a low risk for cardiac etiology and opined that

anxiety might be contributing to Plaintiff's condition. *Id*. at ¶ 11 & Ex. B (AGO 0217).

Defendant Mindoro set a follow-up visit after six weeks. *Id.*

### c. October 22, 2015 Visit with Defendant Mindoro

On October 22, 2015, Plaintiff had his follow-up visit with Defendant Mindoro. Skebe

Decl. ¶ 15 & Ex. B (AGO 0208). Defendant Mindoro addressed both Plaintiff's neck strain

complaints, as well as his more recent dyspnea-like complaints. *Id.* Plaintiff described his

symptoms as "a little better," but stated that he still had mild discomfort swallowing. *Id.* Plaintiff

denied any weight loss, fever, chills, or night sweats. *Id.* Defendant Mindoro conducted a

physical assessment of Plaintiff and found nothing remarkable. *Id.* Defendant Mindoro noted no

thyroid mass. *Id.*

Defendant Mindoro reviewed Plaintiff's cervical spine x-ray from September 11, 2015,

chest x-ray from September 22, 2015, EKGs from September 25, 2015, and October 8, 2015, and

blood test results from September 25, 2015, and October 7, 2015, and found all to be

unremarkable. *Id.*

---

[6] "Dyspnea" is shortness of breath. *See* https://www.webmd.com/lung/shortness-breath-dyspnea#1 (visited on July 12, 2019).

Defendant Mindoro's assessment continued to be that Plaintiff had a neck strain, consistent with his prior finding. *Id.* Defendant Mindoro instructed Plaintiff to continue Tylenol and naproxen for pain, to moderate activity as tolerated, and to contact medical staff of any different or worsening symptoms. *Id.*

### d. November 10, 2015 Visit with Defendant Mindoro

On November 10, 2015, Plaintiff was examined by Defendant Mindoro for an ear infection. Skebe Decl. ¶ 17 & Ex. B (AGO 0202). During Plaintiff's appointment, Defendant Mindoro followed up regarding Plaintiff's suspected neck muscle strain injury. *Id.* Plaintiff reported that he was without pain in his neck or chest and reported significant improvement in pain symptoms with activity. *Id.* In response to Plaintiff's request for an MRI and belief that he needed surgery, Defendant Mindoro told him that his muscle strain appeared to be healing well and that surgery or an MRI was not indicated. *Id.*; *see* Mindoro Decl. ¶ 21.

### e. Medical Treatment with Other Providers in 2015

In addition to Plaintiff's four appointments with Defendant Mindoro in 2015, Plaintiff saw several other medical providers during 2015 for the same issue, as a result of his submission of numerous CDC 7632 Health Care Service Requests and requests for emergency care at the Triage Clinic. These visits included:

- July 23, 2015 appointment with Nurse Lozada in response to a CDC 7362 Health Care Services Request submitted on July 21, 2015;

- August 3, 2015 appointment with Nurse Lozada in response to a CDC 7362 Health Services Request submitted on July 30, 2015;

- September 6, 2015 emergency visit to the Triage Clinic;

- September 11, 2015 cervical spine x-ray ordered by Dr. Ahmed;

- September 25, 2015 emergency visit to the Triage Clinic;

- October 5, 2015 appointment with Nurse Lozada in response to a CDC 7362 Health Care Services Request submitted on September 28, 2015;

- October 12, 2015 appointment with Nurse Lomibao in response to a CDC 7362 Health Care Services Request submitted on October 9, 2015; and

- November 2, 2015 appointment with Nurse Lozada in response to a

CDC 7362 Health Care Services Request submitted on October 30, 2015.

*See* Skebe Decl. ¶¶ 5, 7-9, 12-14, 16 & Ex. B (AGO 0204-0207, 0209-0216; 0219-0221; 0223-0224; 0226-0228).

### 3. Specific Treatments Provided to Plaintiff During His Medical Visits in 2016

#### a. 2016 Treatment by Defendant Mindoro

In 2016, Plaintiff was examined by Defendant Mindoro on June 2, June 7, and August 11. During those appointments, Defendant Mindoro continued to prescribe a course of treatment based on his assessment of Plaintiff's condition, the results of diagnostic testing, and the evaluations of Plaintiff's other medical care providers. Mindoro Decl. ¶¶ 23-31; *see* Skebe Decl. ¶¶ 20, 23, 25 & Ex. B (AGO 0171-0174, 0180-0181, 0187-0189).

#### b. Medical Treatment with Other Providers in 2016

In addition to Plaintiff's regular appointments with Defendant Mindoro, Plaintiff saw several other medical providers during 2016 for the same issue, again as a result of his submission of numerous CDC 7632 Health Care Service Requests and requests for emergency care at the Triage Clinic. Among these visits were:

> • May 23, 2016 appointment with Nurse Shen in response to the CDC 7362 Health Care Services Request submitted on May 19, 2016;
>
> • June 1, 2016, 8:13 a.m. emergency visit to the Triage Clinic;
>
> • June 2, 2016, 7:50 p.m. emergency visit to Triage Clinic;
>
> • June 3, 2016 Transport and Visit to Natividad Medical Center; and
>
> • July 26, 2016 appointment with Nurse Rocomora in response to the CDC 7362 Health Care Services Request submitted on July 25, 2016.

*See* Skebe Decl. ¶¶ 18-19, 21-22, 24 & Ex. B (AGO 0175, 0183-0186, 0190-0195, 0255-0269).

### 4. Plaintiff's Medical Care After Defendant Mindoro Left in 2017

Defendant Mindoro last treated Plaintiff on August 11, 2016, before the doctor transferred to a different facility in July 2017. Mindoro Decl. ¶ 7.

On July 20, 2017, Plaintiff had a consultation with Dr. Pierrette Lenoir, who confirmed the diagnosis of costocondritis and opined that an MRI would not change the management of Plaintiff's health at that time. Skebe Decl. ¶ 27 & Ex. B (AGO 0046-0048); *see* Mindoro Decl.

¶ 32. Dr. Lenoir also noted that Plaintiff's condition might be aggravated by his depression. Skebe Decl. ¶ 27 & Ex. B (AGO 0046-0048).

On September 8, 2017, Plaintiff saw Nurse Cho in response to a CDC 7362 Health Care Services Request he submitted on September 6, 2017, requesting to see Dr. Lenoir again so he could again request an MRI. Skebe Decl., ¶ 28 & Ex. B (AGO 0042-0044).

Plaintiff was also seen by Dr. Anderson on October 16, 2017 and Dr. Rachael Ross on December 6, 2017, both of whom confirmed the diagnosis of costochondritis. Skebe Decl. ¶¶ 29-30 & Ex. B (AGO 0079-0081). Dr. Ross further found Plaintiff's requests for an MRI unwarranted and opined that "the majority of his issues are related to anxiety" and referred him for a mental health appointment. *Id*. at ¶ 30 & Ex. B (AGO 0079-0080).

### 5. Plaintiff's Medical Care in 2018

On January 3, 2018, Plaintiff saw Dr. Ross for a follow-up appointment. Skebe Decl. ¶ 31 & Ex. B (AGO 0077-0078). Dr. Ross noted that Plaintiff "continues his nonstop insistence on getting an MRI of his chest." *Id*. Dr. Ross noted that Plaintiff "refuses to accept any of the diagnosis place[d] in front of him and continues to [insist] that he is dying and needs an MRI." *Id*. Dr. Ross advised Plaintiff that his test results confirmed a vitamin D deficiency, which can cause sternal pain and sternal tenderness. *Id*. Plaintiff was "resistant to the information that he has a vitamin D deficiency," stated that Dr. Ross "made that up," and claimed that the only thing that would make him believe her is if she would order an MRI. *Id*. Dr. Ross showed Plaintiff case studies related to vitamin D deficiency causing sternal pain but Plaintiff stated he was unwilling to take vitamin D and would continue "to fight until he gets an MRI and that he will probably sue." *Id*. Dr. Ross again explained to Plaintiff that there was no indication for an MRI at that time. *Id*.

Regarding Plaintiff's diagnosis of costochondritis, Dr. Ross advised Plaintiff that, medically, there was not much that could be done to address the condition. *Id*. Plaintiff became "combative and argumentative," indicating he really wanted surgery and wanted to know why the state would not pay for him to get an MRI. *Id*. Plaintiff was escorted out of the appointment and instructed to continue his mental health treatment. *Id*. In additional to costochondritis, and a vitamin D deficiency, Dr. Ross diagnosed Plaintiff with panic attacks, and noted as follows:

"Patient needs to continue care with mental health visit[s] obviously nothing medically that I can do for him at this time. His issues seem to be psychologically motivated." *Id.* Dr. Ross noted that Plaintiff "refuses all medical intervention at this time" and instructed him to "follow-up when necessary." *Id.*

On January 26, 2018, Plaintiff saw Nurse Priscilla Perry in response to a CDC 7362 Health Care Services Request he submitted on January 23, 2018, complaining that he was in pain and stating as follows: "It gets hard to breathe when I walk and I feel heavy compression in between my pectoralis major/minor . . . very painful. My body is telling me I need surgery. All attempts to receive an MRI have been denied." *Id.* at ¶ 30 & Ex. B, AGO 0033-0036. Nurse Perry noted that Plaintiff arrived in stable condition and did not appear to be in any acute distress. *Id.* Other than tenderness to palpation to his upper sternum, Plaintiff's physical examination was unremarkable. *Id.* Plaintiff stated he was frustrated that he was unable to get an MRI and that his prior appointment with Dr. Ross upset him because she referred him to mental health for anxiety. *Id.* Nurse Perry "educated [Plaintiff] on implication of low vitamin D in the body as it relates to calcium absorption and how long term Vitamin D deficiency can lead to low calcium level and eventually to issues with brittle bones." *Id.* Nurse Perry further educated him "that since he is close to parol[]ing to focus on doing well inside and leaving this institution and [he] can get a different opinion from another doctor if he chooses." *Id.* (bracket and footnote added).[7]

In addition to Plaintiff's appointment with Dr. Ross on January 3, 2018 and with Nurse Perry on January 26, 2018, Plaintiff saw other medical providers for his condition in 2018—after filing this lawsuit on February 28, 2018. These visits included:

> • April 3, 2018, visit with Dr. Ross; and
>
> • June 19, 2018, appointment with Nurse Nicolas and consultation with Dr. Ross in response to a CDC 7362 Health Care Services Request submitted on June 17, 2018.

*See* Skebe Decl. ¶¶ 33-34 & Ex. B (AGO 0028-0031, 0075-0077).

---

[7] As mentioned above, Plaintiff is no longer incarcerated. *See* Dkt. No. 18. According to his most recently filed notice of change of address, he has been out of prison since October 28, 2018. *Id.*

Plaintiff filed a 602 inmate appeal, log no. CTF HC 17044926, on December 27, 2016, requesting: (1) to see a specialist for his "muscular-skeletal sports related injury"; (2) that "an MRI or ultrasound" be ordered "to take a direct look at [his] injury"; and (3) that he be assigned to a different PCP.  Skebe Decl. ¶ 36 & Ex. D (AGO 0274, 0276).

Defendant Mulligan-Pfile served as the first-level reviewer for this inmate appeal.  Skebe Decl. ¶ 36 & Ex. D (AGO 0274); Mulligan-Pfile Decl. ¶ 8.  Defendant Mulligan-Pfile interviewed Plaintiff, examined Plaintiff remotely "via a Telemedicine appointment" on January 27, 2017, and issued her response on January 30, 2017.  Skebe Decl. ¶ 36 & Ex. D (AGO 0274, 0280-0281); Mulligan-Pfile Decl. ¶ 9.  Defendant Mulligan-Pfile noted that Plaintiff "continue[s] to describe pain at lower left lateral edge of [his] sternum with certain activities such as lifting more tha[n] 10-15 lbs[.] with [his] arms . . . [and] describe[s] the pain as 'excruciating.'"  Skebe Decl. ¶ 36 & Ex D (AGO 0280-0281).  Defendant Mulligan-Pfile stated her findings as follows:

> You have a known history of costochondritis and your clinical presentation is consistent with this condition.  You are already prescribed appropriate anti-inflammatory medication for the treatment of pain and inflammation associated with this condition. There is no indication for referral to a sub-specialist, nor for an MRI, as this is a common non-surgical condition that is treated with activity modification and anti-inflammatory medication.  You are encouraged to continue avoiding aggravating activity.

*Id.* Defendant Mulligan-Pfile denied Plaintiff's request for an MRI or ultrasound, a specialist referral, and reassignment to a different PCP.  *Id.*; *see* Mulligan-Pfile Decl. ¶ 11.  Other than serving as the first level reviewer of Plaintiff's health care appeal, Defendant Mulligan-Pfile provided no other medical treatment for Plaintiff related to his alleged injury and diagnosis of costochondritis at any point in time from his initial complaint in July 2015 through the time he filed suit in February 2018.  Mulligan-Pfile Decl. ¶ 13.  In rendering her first-level decision, Defendant Mulligan-Pfile carefully reviewed Plaintiff's medical records, including the results of prior imaging, diagnostic testing, and laboratory work, his diagnosis and current treatment plan, and the basis of Plaintiff's appeal.  *Id.* at ¶ 10; Skebe Decl. ¶ 36 & Ex. D (AGO 280-281).  Based on this review, Defendant Mulligan-Pfile's medical opinion was that neither an MRI nor an ultrasound was medically warranted at that time.  Mulligan-Pfile Decl. ¶¶ 11, 14; Skebe Decl. ¶ 36

& Ex. D (AGO 280-281).

Defendant Posson served as the second-level reviewer of Plaintiff's inmate appeal CTF HC 17044926. Skebe Decl. ¶ 36 & Ex. D (AGO 0275, 0278-0279); Posson Decl. ¶ 7. Defendant Posson conducted a careful review of Plaintiff's clinical chart, and Defendant Posson also reviewed the initial grievance, written appeal to the second level, and first-level decision. Skebe Decl. ¶ 36 & Ex. D (AGO 0278-0279); Posson Decl. ¶ 9. Defendant Posson denied each of Plaintiff's three requests and noted in his response as follows:

> Regarding issue #1 your request "to be seen by a train[ed] professional that specializes in sports-related muscular injuries" is denied on second level review. Careful review of your recent clinical chart reveals that your diagnosis is chronic costochondritis. As such, treatment is accomplished with activity modification and anti-inflammatory medication as needed. Specialty referral to a surgeon, sports physician, or rehabilitation specialist is not indicated at this time.
> . . . .
>
> Regarding issue #2 requesting "that a direct [look] be taken of this injury via MRI or ultrasound" is denied on the second level of review. Further diagnostic imaging does not appear to be indicated at this time based on a careful review of your medical records. Please continue to cooperate with your primary care provider and treatment of this condition.
>
> Regarding issue #3 requesting "to be reassigned to a different doctor" is denied on second level review. While you may refuse treatment you may not be selective in the choice of your physician. Provider assignments are based on the needs of the institution. It is noted that you have had a second opinion from another provider regarding your condition, via the medical appeals process.

Skebe Decl. ¶ 36 & Ex. D (AGO 0279); Posson Decl. ¶¶ 9-10. Defendant Posson denied Plaintiff's second-level appeal on March 6, 2017. *Id.*; Posson Decl. ¶ 10, 13.

Other than serving as the second-level reviewer of Plaintiff's health care appeal, Defendant Posson provided no other medical treatment for Plaintiff related to his alleged injury and diagnosis of costochondritis at any point in time from his initial complaint in July 2015 through the time he filed suit in February 2018. Posson Decl. ¶ 12.[8]

---

[8] The Court notes that in another 602 appeal, log no. CTF HC 18001050 filed on June 21, 2018, Defendant Posson served as first level reviewer. *See* Posson Decl. ¶ 12. In that appeal, Plaintiff claimed deliberate indifference to his serious medical needs "by refusing to administer the proper treatment" in June 2018, which was several months after Plaintiff filed the instant suit

14

1    In rendering his second-level decision, Defendant Posson carefully reviewed Plaintiff's

2    clinical chart, including his diagnosis and current treatment plan, the decision of the first level, and

3    the basis of Plaintiff's initial grievance and appeal to the second level.  Skebe Decl. ¶ 36 & Ex. D

4    (AGO 0278-0279); Posson Decl. ¶¶ 9-10.  Based on this review, Defendant Posson's medical

5    opinion was that neither an MRI nor an ultrasound was medically warranted at that time.  *Id.*

6    The third-level decision on Plaintiff's inmate appeal affirmed the second-level decision on

7    June 13, 2017.  Skebe Decl. ¶ 36 & Ex. D (AGO 0272-0273).

## III.    DISCUSSION

### A.    Standard of Review

10   Summary judgment is proper where the pleadings, discovery and affidavits show there is

11   "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of

12   law."  *See* Fed. R. Civ. P. 56(a).  Material facts are those that may affect the outcome of the case.

13   *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A dispute as to a material fact is

14   genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving

15   party.  *See id.*

16   A court shall grant summary judgment "against a party who fails to make a showing

17   sufficient to establish the existence of an element essential to that party's case, and on which that

18   party will bear the burden of proof at trial[,] . . . since a complete failure of proof concerning an

19   essential element of the nonmoving party's case necessarily renders all other facts immaterial."

20   *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).  The moving party bears the initial

21   burden of identifying those portions of the record that demonstrate the absence of a genuine issue

22   of material fact.  *Id.*  The burden then shifts to the nonmoving party to "go beyond the pleadings

23   and by [his] own affidavits, or by the 'depositions, answers to interrogatories, and admissions on

24   file,' designate 'specific facts showing that there is a genuine issue for trial.'"  *See id.* at 324

25   (citing Fed. R. Civ. P. 56(e) (amended 2010)).

26   For purposes of summary judgment, the court must view the evidence in the light most

27

28   _____

on February 28, 2018.  *See id.*

favorable to the nonmoving party; if the evidence produced by the moving party conflicts with evidence produced by the nonmoving party, the court must assume the truth of the evidence submitted by the nonmoving party. *See Leslie v. Grupo ICA*, 198 F.3d 1152, 1158 (9th Cir. 1999). The court's function on a summary judgment motion is not to make credibility determinations or weigh conflicting evidence with respect to a disputed material fact. *See T.W. Elec. Serv., Inc., v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987).

Only admissible evidence may be considered in ruling on a motion for summary judgment. *Orr v. Bank of Am.*, 285 F.3d 764, 773 (9th Cir. 2002). In support of the motion for summary judgment, Defendants submit declarations and supporting exhibits, including medical records, from the following: Defendants Mindoro, Mulligan-Pfile, and Posson (Dkt. Nos. 17-1, 17-2, 17-3); and Deputy Attorney General Howard Skebe (Dkt. Nos. 17-4 to 17-8). Plaintiff has filed his verified complaint (Dkt. No. 1), his verified opposition to Defendants' motion and his declaration (Dkt. Nos. 19, 19-2 at 3-4), declarations from inmates J. Bordelon (Dkt. No. 19-2 at 5-7) and Clayton Wiese (Dkt. No. 19-2 at 8-11), as well as various exhibits, including medical records, in support of his opposition (Dkt. No. 19-1). The Court will construe these filings as affidavits under Federal Rule of Civil Procedure 56, insofar as they are based on personal knowledge and set forth specific facts admissible in evidence. *See Schroeder v. McDonald*, 55 F.3d 454, 460 & nn.10-11 (9th Cir. 1995) (treating plaintiff's verified complaint as opposing affidavit where, even though verification not in conformity with 28 U.S.C. § 1746, plaintiff stated, under penalty of perjury, contents were true and correct, and allegations were not based purely on information and belief but rather on personal knowledge).

Defendants have filed objections to Plaintiff's evidence in support of his opposition. Dkt. No. 20 at 17-18. Defendants assert some of Plaintiff's exhibits either: (1) lack a foundation of personal knowledge or expertise; (2) contain hearsay; (3) are speculative; and (4) are irrelevant and outside the scope of this action. Although the Court may discuss some of Plaintiff's evidence in question in its analysis, the Court also points out within its analysis why this evidence is not sufficient to defeat summary judgment. The Court concludes that even if any of Plaintiff's evidence is admitted and accepted at face value, Defendants still would be entitled to judgment as

a matter of law, as set forth below. Accordingly, Defendants' objections to Plaintiff's evidence are OVERRULED as moot.

### B.    Analysis

Deliberate indifference to a serious medical need violates the Eighth Amendment's proscription against cruel and unusual punishment. *See Estelle v. Gamble*, 429 U.S. 97, 104 (1976); *McGuckin v. Smith*, 974 F.2d 1050, 1059 (9th Cir. 1992), *overruled on other grounds by WMX Technologies, Inc. v. Miller*, 104 F.3d 1133, 1136 (9th Cir. 1997) (en banc). A determination of "deliberate indifference" involves an examination of two elements: the seriousness of the prisoner's medical need and the nature of the defendant's response to that need. *See McGuckin*, 974 F.2d at 1059.

A "serious" medical need exists if the failure to treat a prisoner's condition could result in further significant injury or the "[u]nnecessary and wanton infliction of pain." *McGuckin*, 974 F.2d at 1059 (citing *Estelle*, 429 U.S. at 104). The "existence of chronic and substantial pain [is an] . . . indication[] that a prisoner has a 'serious' need for medical treatment." *Id.* at 1060.

A prison official is deliberately indifferent if he knows that a prisoner faces a substantial risk of serious harm and disregards that risk by failing to take reasonable steps to abate it. *Farmer v. Brennan*, 511 U.S. 825, 837 (1994). The prison official must not only "be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists," but he "must also draw the inference." *Id.* If a prison official should have been aware of the risk but was not, then the official has not violated the Eighth Amendment, no matter how severe the risk. *Gibson v. County of Washoe*, 290 F.3d 1175, 1188 (9th Cir. 2002). Mere negligence, or even gross negligence, is not enough. *Farmer*, 511 U.S. at 835-36 & n.4.

A showing of nothing more than a difference of medical opinion as to the need to pursue one course of treatment over another is insufficient, as a matter of law, to establish deliberate indifference. *See Toguchi v. Chung*, 391 F.3d 1051, 1058-60 (9th Cir. 2004); *Sanchez v. Vild*, 891 F.2d 240, 242 (9th Cir. 1989); *Mayfield v. Craven*, 433 F.2d 873, 874 (9th Cir. 1970). In order to prevail on a claim involving choices between alternative courses of treatment, a plaintiff must show that the course of treatment the medical professional chose was medically unacceptable

17

under the circumstances, and that the professional chose this course in conscious disregard of an excessive risk to plaintiff's health. *Toguchi*, 391 F.3d at 1058; *Jackson v. McIntosh*, 90 F.3d 330, 332 (9th Cir. 1996) (citing *Farmer*, 511 U.S. at 837).

Defendants argue they are entitled to summary judgment on Plaintiff's Eighth Amendment claim for deliberate indifference to medical needs on the ground that there are no material facts in dispute. Defendants add that, assuming their actions are found to be unconstitutional, it would not have been clear to a reasonable official that such conduct was unlawful, such that they are entitled to qualified immunity.[9]

The Court assumes for purposes of this motion that Plaintiff satisfies the first prong of the deliberate indifference analysis, i.e., that there was a "serious medical need." Assuming arguendo that Plaintiff could show a triable issue on the objective prong of his Eighth Amendment claim, the Court finds that Plaintiff's claim nonetheless fails because there is no evidence showing deliberate indifference or from which deliberate indifference could be inferred. Thus, assuming that Plaintiff had a serious medical need based on his alleged pain from the exercise-related injury in 2015, his claim that he suffered a tear in his pectoral muscle, and the eventual diagnosis of costochondritis, there is no evidence that Defendants knew that Plaintiff faced a substantial risk of harm and consciously disregarded it by failing to take reasonable steps to abate it. *See Farmer*, 511 U.S. at 837.

Instead, the undisputed facts amply demonstrate that Defendants provided Plaintiff with adequate care for his medical condition. Because Defendant Mindoro was Plaintiff's PCP for the majority of the time period at issue in this case, the Court takes into consideration the totality of the treatment that Plaintiff received for his medical condition from July 2015 through Defendant Mindoro's transfer to SVSP in July 2017. The Court finds that during this period, Defendants examined Plaintiff on multiple occasions and provided him treatment according to his clinical presentation. Specifically, Defendant Mindoro examined Plaintiff seven times between the time

---

[9] As set forth below, the Court finds that Defendants are entitled to summary judgment on the merits of Plaintiff's Eighth Amendment claim, making it unnecessary to address Defendants' argument that they are shielded from liability on the theory of qualified immunity.

Plaintiff first expressed concern over his medical condition in July 2015 and July 2017.  *See* Mindoro Decl. ¶ 7; *see also* Skebe Decl. ¶¶ 6, 11, 15, 17, 20, 23, 25 & Ex. B (AGO 0171-0174, 0180-0181, 0187-189, 0202, 0208, 0217, 0225).  At those appointments, Defendant Mindoro conducted physical examinations, ordered diagnostic testing, imaging, and laboratory work, made diagnoses, prescribed medications, and developed and implemented treatment plans for Plaintiff.  *See* Mindoro Decl. ¶¶ 10-11, 19, 22-25, 27-31; *see also* Skebe Decl., Ex. B (AGO 0160-0161, 0165-0166, 0249).  On some of these occasions, Plaintiff reported an improvement of his condition, though these were often followed weeks or even days later with complaints of constant and increased pain.  Mindoro Decl. ¶¶ 21, 29; Skebe Decl. & Ex. B (AGO 0171-0174, 0202, 0208).  While under Defendant Mindoro's care, Plaintiff was also examined by several other medical professionals from July 2015 through July 2017 regarding his condition in response to his submission of CDC 7362 Health Care Service Requests and requests to be seen on an emergency basis at the Triage Clinic.  In sum, in addition to his seven primary care appointments with Defendant Mindoro, Plaintiff was seen fifteen more times by medical personnel from July 2015 through July 2017.  Skebe Decl. ¶¶ 5, 7-10, 12-14, 16, 18-19, 21-22, 24, 26 & Ex. B (AGO 0049, 0073-0074, 0162, 0175, 0183-0186, 0190-0195, 0204-0207, 0209-0216, 0219-0221, 0223-0224, 0226-0228, 0250, 0255-0269).

After Defendant Mindoro transferred to SVSP in July 2017, Plaintiff was treated by his new PCPs and was also seen by other medical professionals in response to further submissions of CDC 7362 Health Care Service Requests.  For example, between July 2017 and June 2018, Plaintiff was seen at least eight times regarding his medical condition.  Skebe Decl. ¶¶ 27-34 & Ex. B (AGO 0028-0031, 0033-0036, 0042-0044, 0046-0048, 0075-0081).  Plaintiff's new PCPs and these other medical providers conducted physical examinations, ordered diagnostic testing, imaging, and laboratory work, made diagnoses, prescribed medications, and implemented treatment plans for Plaintiff.  Skebe Decl. ¶¶ 5, 7-10, 12-14, 16, 18-19, 21-22, 24, 26-34 & Ex. B (AGO 0028-0031, 0033-0036, 0042-0044, 0046-0048, 0049, 0073-0081, 0157-0158, 0162, 0240-0243, 0175, 0183-0186, 0190-0195, 0204-0207, 0209-0216, 0219-0221, 0223-0224, 0226-0228, 0247-0248, 0250, 0255-0269).  Several physicians concurred with Defendant Mindoro's diagnosis

of Plaintiff with costochondritis and the treatment plan, and shared Defendant Mindoro's medical opinion that an MRI was not warranted. Skebe Decl. ¶¶ 22, 27, 29-31, 33-34 & Ex. B (AGO 0028-0031, 0046-0048, 0075-0081, 0255-0269); *see also* Mindoro Decl. ¶¶ 26, 32; Mulligan-Pfile Decl. ¶¶ 11, 14; Posson Decl. ¶¶ 10, 13.

It appears Plaintiff bases his medical indifference claim on the following arguments: (1) Defendant Mindoro failed to provide adequate treatment, including by declining to order an MRI or ultrasound when treating Plaintiff; and (2) Defendants Mulligan-Pfile and Posson affirmed Defendant Mindoro's decisions during their review of Plaintiff's inmate health care appeal. The Court addresses these arguments in turn.

### 1. Defendant Mindoro's Decision Not to Order an MRI or Ultrasound

Plaintiff claims that Defendant Mindoro was deliberately indifferent to his medical needs by denying him adequate treatment for his pain from his exercise-related injury. Aside from Defendant Mindoro's decision not to order an MRI or ultrasound, Plaintiff's opposition includes allegations that (1) improper testing was conducted; (2) he was treated by "incompetent" and "unqualified" medical personnel; (3) medical staff failed to properly inquire into the facts of his specific injury necessary to make a professional judgment; and (4) he did not receive "real treatment" and his appointments involved only "cursory exams." *See* Dkt. No. 19. Defendants respond that there is no evidence supporting the proposition that they acted with a culpable state of mind. Defendants contend that:

> Rather, the evidence demonstrates, that Dr. Mindoro provided consistent, appropriate medical care and that other physicians who treated Calderon concurred with Dr. Mindoro's diagnosis and treatment plan. Moreover, Drs. Mindoro, Mulligan-Pfile, and Posson each individually averred that, had an MRI or ultrasound been medically warranted at that time, they would not have hesitated to order the test. (Mindoro Decl. ¶¶ 22, 31; Mulligan-Pfile Decl. ¶ 15; Posson Decl. ¶ 14.) There is no evidence to support the proposition that either Dr. Mindoro, Dr. Mulligan-Pfile, or Dr. Posson, acted in a "wanton" fashion as required to sustain the subjective element of Calderon's deliberate indifference claim.

Dkt. No. 17 at 29. Defendants note that Plaintiff (1) lacks any medical expertise to opine whether the medical tests he received were appropriate to diagnose and treat his alleged condition, Dkt. No. 20 at 9; (2) provides no evidence to support the proposition that Defendants or any other medical

provider that treated him were either "incompetent" or "unqualified" or failed to meet the standard of care, *id.*; (3) proffers no evidence to support his assertion that Defendants or other medical staff made incorrect professional judgments, acted in a manner below professional standards, or failed to make appropriate inquiries about his condition, *id.* at 12; and (4) fails to describe what he means by "real treatment" and lacks the foundation and expertise to do so, meaning that any characterization of particular medical examinations or visits as too short or "cursory" is conclusory and not supported by references to evidence or expert opinion defining them as such, *id.* at 12-13.

To the extent that Plaintiff is claiming medical malpractice or negligence by Defendant Mindoro in providing treatment, his allegations do not support an Eighth Amendment claim. *See Franklin v. State of Or., State Welfare Div.*, 662 F.2d 1337, 1344 (9th Cir. 1981); *Toguchi*, 391 F.3d at 1060; *McGuckin*, 974 F.2d at 1059 (mere negligence in diagnosing or treating a medical condition, without more, does not violate a prisoner's Eighth Amendment rights); *O'Loughlin v. Doe*, 920 F.2d 614, 617 (9th Cir. 1990) (repeatedly failing to satisfy requests for aspirin and antacids to alleviate headaches, nausea, and pains is not constitutional violation; isolated occurrences of neglect may constitute grounds for medical malpractice but do not rise to level of unnecessary and wanton infliction of pain). Despite Plaintiff's claims that he received inadequate treatment and continued to experience pain, Defendants have submitted a verified declaration from Defendant Mindoro and attached supporting medical records indicating that Plaintiff's conditions and complaints were treated continuously based upon the medical evidence as well as the judgment of the medical providers. As explained in detail above, the evidence shows that from July 2015 through Defendant Mindoro's transfer to SVSP in July 2017, Plaintiff received substantial medical care, including numerous physical examinations, diagnostic testing, imaging, laboratory work, diagnoses, treatment plans, and different courses of medication directed at his particular conditions. *See generally* Mindoro Decl.; *see also* Skebe Decl. ¶¶ 4-34, Ex. B.

In sum, the undisputed evidence (supported by Defendant Mindoro's declaration and Plaintiff's medical records) creates no triable issue of fact as to Plaintiff's claim that he received constitutionally inadequate treatment based on the denial of an MRI or ultrasound. Even if

Plaintiff believes he should have received different treatment, a difference of opinion as to the urgency and appropriate treatment of his medical needs is insufficient, as a matter of law, to establish deliberate indifference. *See Toguchi v. Chung*, 391 F.3d 1051, 1058-60 (9th Cir. 2004); *Sanchez v. Vild*, 891 F.2d 240, 242 (9th Cir. 1989); *Mayfield v. Craven*, 433 F.2d 873, 874 (9th Cir. 1970). In order to prevail on a claim involving choices between alternative courses of treatment, a plaintiff must show that the course of treatment the doctors chose was medically unacceptable under the circumstances and that they chose this course in conscious disregard of an excessive risk to plaintiff's health. *Jackson v. McIntosh*, 90 F.3d 330, 332 (9th Cir.1996) (citing *Farmer*, 511 U.S. at 837). The uncontroverted record establishes that Defendant Mindoro and the medical staff chose a course of treatment that was medically accepted. Several physicians (including Drs. Lawson, Lenoir, Anderson, and Ross as well as Defendants Mulligan-Pfile and Posson) concurred with Defendant Mindoro's diagnosis of Plaintiff with costochondritis, his treatment plan, and his medical opinion that an MRI or ultrasound was not warranted. *See* Skebe Decl. ¶¶ 22, 27, 29-31, 33-34, AGO 0028-0031, 0046-0048, 0075-0081, 0255-0269; *see also* Mindoro Decl. ¶¶ 26, 32; Mulligan-Pfile Decl. ¶¶ 11, 14; Posson Decl. ¶¶ 10, 13. Based on the totality of circumstances, including Plaintiff's complaints regarding his symptoms, his medical history, multiple physical examinations by several medical professionals, diagnostic tests, imaging, and laboratory work, Defendant Mindoro's medical opinion was that neither an MRI nor an ultrasound was medically warranted at that time to treat Plaintiff's diagnosed muscle strain. Mindoro Decl. ¶ 22. Had Defendant Mindoro believed that an MRI or ultrasound was warranted to properly diagnose, treat, or care for Plaintiff, Defendant Mindoro says that he would not have hesitated to order the test. *Id.* Defendant Mindoro adds that cost would not have been a deterrent to ordering such a test for Plaintiff were it medically warranted. *Id.*

While Plaintiff asserts that the treatment he received was improper, he presents no evidence that supports the notion that additional testing in the form of an MRI or ultrasound was medically necessary or would have altered Defendant Mindoro's medical treatment. Rather, the undisputed factual record shows that during the relevant time frame Defendant Mindoro:

(1) continuously monitored and treated Plaintiff, specifically for his complaints of pain from his

exercise-related injury and his costocondritis; (2) ordered diagnostic testing, imaging, and laboratory work, made diagnoses, and prescribed medications; and (3) developed and implemented medically acceptable courses of treatment while being aware of the risks associated with his health problems (i.e., pain from his condition). Thus, Plaintiff has failed to provide any evidence regarding an essential element of his Eighth Amendment claim against Defendant Mindoro, and it fails as a matter of law. *See Celotex*, 477 U.S. at 323. Accordingly, the Court GRANTS Defendants' motion for summary judgment as to Plaintiff's claim involving Defendant Mindoro.

### 2. Defendants Mulligan-Pfile's and Posson's Denial of Plaintiff's Grievance

Plaintiff alleges that the Defendants Mulligan-Pfile and Posson, who handled log no. CTF HC 17044926, were deliberately indifferent to his serious medical needs for failing to grant him the requested relief.

Again, the Court assumes arguendo that, during the relevant time period, Plaintiff had a serious medical need. Defendants Mulligan-Pfile and Posson argue that they are entitled to summary judgment because the undisputed facts show that they were not deliberately indifferent to Plaintiff's serious medical needs. Dkt. No. 17 at 29-30. As explained above, in the 602 appeal at issue, Plaintiff sought a referral to a specialist, an MRI, and to be assigned to a different PCP. Defendant Mulligan-Pfile reviewed Plaintiff's 602 appeal at the first-level, and Defendant Posson reviewed it at the second-level. These Defendants denied the 602 appeal after determining that his requested relief was not medically necessary, including his request for an MRI or an ultrasound.

First, the Court finds that Plaintiff's disagreement with Defendants Mulligan-Pfile's and Posson's handling of his 602 appeal is insufficient, as a matter of law, to establish deliberate indifference. *See Toguchi*, 391 F.3d at 1059-60; *Franklin*, 662 F.2d at 1344.

Second, to the extent that Plaintiff seeks relief against Defendants Mulligan-Pfile and Posson for failing to *grant* his 602 appeal, that claim also fails. Prisoners have no absolute constitutional right to have their grievances heard in a prison administrative appeal system. Although state statutes or regulations may give rise to constitutionally-protected liberty interests

that cannot be taken away without due process of law, California prison regulations do not create any liberty interest in an inmate grievance procedure. The regulations grant prisoners a purely procedural right and set forth no substantive standards, *see* Cal. Code Regs. tit. 15, § 3084 et seq. (applicable to state prisons), and such provisions cannot form the basis of a constitutionally cognizable liberty interest. *See also Smith v. Noonan*, 992 F.2d 987, 989 (9th Cir. 1993); *Mann v. Adams*, 855 F.2d 639, 640 (9th Cir. 1988).

Finally, Defendants Mulligan-Pfile and Posson argue that because Plaintiff was receiving "abundant and thorough medical care," their responses to his 602 appeal were "appropriate" and did not deny Plaintiff appropriate medical care. Dkt. No. 20 at 16. The Court agrees that Plaintiff has failed to carry his burden of raising a genuine issue of fact as to his claim that Defendants Mulligan-Pfile's and Posson's actions rose to the level of deliberate indifference to his serious medical needs. The undisputed evidence shows that Defendants Mulligan-Pfile and Posson did not subject Plaintiff to medical deliberate indifference in violation of the Eighth Amendment by improperly handling his 602 appeal. To the contrary, before responding to the 602 appeal, these Defendants reviewed his medical records and CDCR policy to determine if his requests were medically necessary. Mulligan-Pfile Decl. ¶ 9; Posson Decl. ¶ 9. Additionally, Defendant Mulligan-Pfile interviewed Plaintiff "via a Telemedicine appointment" on January 27, 2017. Mulligan-Pfile Decl. ¶ 9. Plaintiff contends that an MRI or a referral to a specialist would have led to other courses of treatment, and that these Defendants' handling of his 602 appeal was medically unacceptable and led to greater pain that lingered for "several years until [his] release." Dkt. No. 19 at 2. The Court finds that Plaintiff's argument reflects nothing more than a difference of medical opinion, i.e., a claim that if these Defendants had handled the appeal differently and granted him different treatment, then he would not have suffered more unnecessary pain. Again, to the extent that Plaintiff disagrees with their conclusions, this is not enough to show a triable issue of material fact, because a difference of medical opinion as to the urgency and treatment of his medical needs is insufficient, as a matter of law, to establish deliberate indifference. *See Toguchi*, 391 F.3d at 1059-60; *Franklin*, 662 F.2d at 1344; *see also Sanchez v. Vild*, 891 F.2d 240, 242 (9th Cir. 1989) (citing *Randall v. Wyrick*, 642 F.2d 304, 308 (8th Cir. 1981); *Estelle*, 429 U.S.

at 107.  In addition, while Plaintiff asserts that these Defendants' denial of his requests for an MRI or a referral to a specialist worsened his condition, he presents no medical or other evidence to support this theory.  Plaintiff's conclusory allegations unsupported by evidence are insufficient to defeat Defendants' motion for summary judgment.  *Cf. Arpin v. Santa Clara Valley Transp. Agency*, 261 F.3d 912, 922 (9th Cir. 2001) (finding the district court did not err in granting summary judgment because plaintiff failed to meet her burden of proof of providing specific facts to show that the force used was unreasonable).  Instead, the record shows that Defendants Mulligan-Pfile and Posson determined that none of his requests—for a referral to a specialist, an MRI test, and reassignment to another PCP—were medically necessary at the time they reviewed his appeal.  Accordingly, Plaintiff has presented no evidence upon which a reasonable jury could find that these Defendants' denial of his requests was "medically unacceptable under the circumstances" or in "conscious disregard of an excessive risk to [his] health."  *See Toguchi*, 391 F.3d at 1058-60.

There is no triable issue of fact as to Plaintiff's claim for deliberate indifference to serious medical needs against Defendants Mulligan-Pfile and Posson, and they are entitled to summary judgment as a matter of law  *See Celotex*, 477 U.S. at 323.

## IV.    CONCLUSION

For the foregoing reasons, Defendants' motion for summary judgment (Dkt. No. 17) is GRANTED.

The Clerk of the Court shall terminate all pending motions and close the file.

**IT IS SO ORDERED.**

Dated:  8/23/2019

HAYWOOD S. GILLIAM, JR.
United States District Judge

25